**NATIONAL FOOTBALL LEAGUE, Plaintiff,**

**v.**

**INSIGHT TELECOMMUNICATIONS CORPORATION, Defendant.**

**CIV.A. No. 99–CV–12053–RCL.**

United States District Court, D. Massachusetts.

Aug. 21, 2001.

John Vanderstar, Covington & Burling, Washington, DC, John K. Felter, Goodwin Procter LLP, Boston, MA, Neil K. Roman, Ronald G. Dove, Jr., Thomas L. Cubbage, III, Covington & Burling, Washington, DC, for National Football League, Plaintiffs.

Peter B. Krupp, Lurie & Krupp, LLP, Boston, for Insight Telecommunications Corporation, Defendants.

## ORDER ON MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANT INSIGHT'S MOTION FOR SUMMARY JUDGMENT

LINDSAY, District Judge.

Before the court is the motion of the defendant, Insight Telecommunications, Inc. ("Insight"), for summary judgment based on the "passive carrier" exemption from copyright liability, codified at 17 U.S.C. § 111(a)(3). The motion for summary judgment and accompanying papers were referred to Magistrate Judge Lawrence P. Cohen. On June 14, 2001, Magistrate Judge Cohen issued his report and recommendation, in which he recommended that Insight's motion be allowed. The plaintiff, National Football League (the "NFL"), submitted a timely objection to the report and recommendation, to which Insight responded. Upon consideration of the report and recommendation and the responses thereto, I accept the recommendation of the magistrate judge that Insight's motion for summary judgment be granted.

On a related matter, the NFL maintains that the magistrate judge's refusal to allow additional discovery on the "passive carrier" defense was erroneous and renders summary judgment for Insight inappropriate. The NFL's failure to object in a timely fashion to the magistrate judge's ruling on the NFL's motion for additional discovery precludes the court from reconsideration of that ruling. See Fed.R.Civ.P. 72(a).

The motion of Insight for summary judgment is ALLOWED. The clerk shall enter judgment for the defendant.

So ordered.

## REPORT AND RECOMMENDATION ON MOTION FOR SUMMARY JUDGMENT

LAWRENCE P. COHEN, United States Magistrate Judge.

In this action, by way of its original complaint,[1] plaintiff, National Football League ("NFL") sues defendant Insight Communications Corporation ("Insight"), for violating its copyright in copyrighted materials by transmitting its copyrighted materials in interstate commerce on a number of occasions in 1999. On account of that, plaintiff seeks statutory damages and injunctive relief under the copyright laws. 17 U.S.C. §§ 502(a) and 504(c)(2).

---

**1.** After defendant filed its motion for summary judgment, plaintiff moved to file an amended complaint. That motion to amend, which included the addition of other parties defendant, was allowed in part and denied in part, but discovery on all aspects of the case was stayed pending ruling on Insight's motion for summary judgment.

As part of its answer, Insight averred as its Sixth Affirmative Defense that it was, at all relevant times, a passive carrier within the meaning of 17 U.S.C. § 111(a)(3), and thus exempt from liability for infringement—directly or indirectly. Insight has now moved for summary judgment on the basis of this affirmative defense, and the motion for summary judgment was referred to this court for report and recommendation.

## I. *Procedural History*

The original complaint was filed on October 5, 1999. On November 2, 1999, plaintiff also filed a motion for preliminary injunctive relief (# 08). On November 23, 1999, defendant filed a motion to dismiss (# 26). That motion to dismiss was premised on the ground that any infringement, if at all, occurred in Canada, not the United States. That motion was denied by the district judge to whom this case is assigned on February 4, 2000 (# 31). On the same day, plaintiff's motion for a preliminary injunction was also denied (# 32).[2]

On August 1, 2000, plaintiff filed a motion to amend the complaint. That motion was allowed in part and denied in part.[3] On August 11, 2000, while plaintiff's motion to amend was pending, defendant filed a motion to stay all discovery pending disposition of its motion for summary judgment filed on the same day.[4] To the extent that that motion sought to stay all discovery, the motion was allowed in part and denied in part. Anticipating that

plaintiff might seek relief under Rule 56(f), F.R. Civ. P., this court noted (Amended Order [# 59] dated August 25, 2000):

> To the extent that defendant will seek summary judgment on this ground, plaintiff would certainly be entitled to take discovery bearing on that issue under Rules 56(e) and 56(f) of the Federal Rules of Civil Procedure.

On August 18, 2000, plaintiff moved to extend the time within which to file a response to the motion for summary judgment (# 54). On August 21, 2000, that motion was allowed by the district judge to whom this case is assigned, and plaintiff was ordered to file its response on or before September 6, 2000. Seven days later, on August 28, 2000, plaintiff filed an "emergency" motion (# 60) to extend the time within which to file a response to the motion for summary judgment. That motion was based exclusively on a position by the plaintiff that it, notwithstanding the previous order of this court staying discovery,[5] wanted to conduct further unspecified discovery. This court denied that motion, indicating *inter alia* (Order, August 21, 2000 [# 64]):

> The previous order did not provide that the plaintiff was entitled to take further discovery. It only provided that plaintiff could seek appropriate relief under Rules 56(e) and(f) of the Federal Rules of Civil Procedure.

> On the basis of the current record, this court cannot fairly conclude that the

---

**2.** In denying the motion for preliminary injunctive relief, the district judge concluded that defendant had made a substantial showing that it was a "passive carrier" within the meaning of 17 U.S.C. § 111(a)(3), and thus exempt from liability for infringement—directly or indirectly.

**3.** See note 1 above.

**4.** The memorandum in support of the motion for summary judgment (# 51) included a Statement of Undisputed Material Facts consistent with the provisions of Rule 56, F.R. Civ. P., and Rule 56.1 of the Local Rules of this Court.

**5.** Insofar as this court can determine, plaintiff never filed an objection to any of the orders entered by this court under the provisions of Rule 72(a), F.R. Civ. P.

eleventh hour discovery sought—whatever that might be—will raise a material dispute of facts bearing on the narrow issue raised by the defendant in its motion for summary judgment.

This does not, of course, preclude plaintiff from filing an *appropriate* Rule 56(f) motion. But plaintiff has not done so yet. (Emphasis in original; footnotes omitted).

On September 6, 2000, plaintiff filed its response to defendant's motion for summary judgment (# 50). That response did not include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried as required by Rule 56.1 of the Local Rules of this Court.[6]

After defendant filed a reply to plaintiff's memorandum in opposition to the motion for summary judgment, plaintiff moved to file a sur-reply. That sur-reply, however, included more than additional arguments. It included new statements of fact. In denying the motion to file a sur-reply to the extent that that motion sought, for the first time, to include new facts in opposition to the motion for summary judgment, this court observed (Order, September 29, 2000 [# 75] ), among other things:

> . . . the Motion to File Sur–Reply in Opposition to Defendant's Motion for Summary Judgment on the Sixth Affirmative Defense (# 72) is denied to the extent

that plaintiff seeks to expand the factual record.

Plaintiff says (The National Football League's Response to Insight's Partial Opposition to Motion for Leave to File Sur–Reply [# 74, p. 2] ) that [n]o rule precludes the submission of evidence in circumstances such as these. On that, plaintiff is plainly wrong.

On August 21, 2000, the district judge to whom this case is assigned ordered that plaintiff's opposition to defendant's motion for summary judgment be filed on or before September 6, 2000. Under the Local Rules of this Court, an opposition to a motion for summary judgment includes, not only legal argument, but any and all factual predicates for showing the existence of a material fact. That filing date has never been extended by the district judge to whom this case is assigned or by this court.

Accordingly, the Motion to File Sur–Reply in Opposition to Defendant's Motion for Summary Judgment on the Sixth Affirmative Defense (# 72) is denied to the extent that plaintiff seeks to expand the factual record. (footnotes omitted).

One week later, plaintiff filed yet another motion—this one captioned "Plaintiff's Motion to Renew Rule 56(f) Request, or, in the Alternative, for Relief under Rule 56(f)" (# 77). This court denied that mo-

---

6. That Rule provides:

**RULE 56.1 MOTIONS FOR SUMMARY JUDGMENT**

Motions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation. Failure to include such a statement constitutes grounds for denial of the motion. *Opposition to motions for summary judgment shall include a concise statement of the material facts of record as to*

which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation. Copies of all referenced documentation shall be filed as exhibits to the motion or opposition. *Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties.* (Emphasis added).

tion on October 18, 2000 (Order # 80), observing, among other things:

> For one thing, to the extent that the caption of plaintiff's motion suggests that it simply seeks to *renew* its Rule 56(f) motion, the caption is clearly misleading. And that is because that plaintiff has never, in the past, filed a Rule 56(f) motion. A buried and passing reference in an *opposition* to a motion for summary judgment is simply not the Rule 56(f) motion contemplated by the Federal Rules of Civil Procedure. Indeed, plaintiff surely must have known that, since plaintiff, at or about the same time, attempted to supplement the factual record—albeit unsuccessfully—with a so-called sur-reply.
>
> For another, to the extent that plaintiff now, for the first time, seeks relief under Rule 56(f), plaintiff seeks that relief too late. In the Order of this court dated August 31, 2000, this court clearly indicated to plaintiff, almost in the form of an invitation, that should plaintiff require additional discovery to meet defendant's motion for summary judgment, it could file for appropriate relief under Rule 56(f). Plaintiff chose to spurn the invitation—an obviously deliberate choice.
>
> This court does not gainsay, as suggested by plaintiff, that Rule 56(f) should be liberally construed. But is one thing to say that Rule 56(f) should be liberally construed, and another to say that the requirements of that rule should be ignored willy-nilly at the option of a party—particularly where that party was previously invited to file a Rule 56(f) motion, but, for whatever reason, declined to do so.
>
> "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(quoting Fed.R. Civ. P. 1). The relief which plaintiff seeks stands that principle on its head, making the summary judgment procedure not unlike shooting at a moving target.

## II. *Undisputed Material Facts*

Based on the Statement of Undisputed Material Facts submitted, as well as those matters not disputed by the defendant for purposes of its motion for summary judgment, this court finds the following material facts to be undisputed:

1. The NFL owns the copyright in all regular season and post-season NFL game telecasts, as confirmed by the League's contracts with the networks.

2. At the time the original complaint was filed, the NFL was in the process of registering with the U.S. Copyright Office copyright in the following NFL game telecasts (each of which was identified in the Advance Notice of Potential Infringement):

**September 26, 1999 Denver Broncos versus Tampa Bay Buccaneers**

**September 26, 1999 Minnesota Vikings versus Green Bay Packers**

**September 27, 1999 San Francisco 49ers versus Arizona Cardinals**

**October 3, 1999 New England Patriots versus Cleveland Browns**

**October 3, 1999 Carolina Panthers versus Washington Redskins**

**October 3, 1999 New York Jets versus Denver Broncos**

**October 4, 1999 Buffalo Bills versus Miami Dolphins**

3. Plaintiff is the owner of copyright in all the NFL game telecasts identified in Paragraph 2 above.

4. Insight is in the business of retransmitting telecommunications signals and providing other related services for a wide array of customers in the broadcasting and telecommunications industries. For the most part, Insight does not own wires or transmission facilities, but provides wires and transmission facilities to its customers through subcontracts with others.

5. By September, 1999, Insight had entered into a Transmission Services Agreement with Bell Canada. Under that Agreement, for a monthly fee, Insight agreed to provide Bell Canada with efficient reception of six Boston television signals ("the Signals") and relay of the Signals to video compression equipment provided by Bell Canada.

6. Following execution of the Transmission Services Agreement with Bell Canada, Insight entered into a Transmission Services Agreement with Videocom Satellite Associates, Inc. ("Videocom"), a Delaware corporation with its principal place of business at 502 Sprague Street, Dedham, Massachusetts. Under that Agreement, which was not actually signed until the Fall of 1999, Videocom agreed to provide off-air reception of Boston area television signals and interconnection to the designated video compression equipment. Prior to the signing of that Agreement, Videocom agreed to supply Insight with the equipment necessary for Insight to perform its Agreement with Bell Canada.

7. At all times relevant to the Complaint (and Amended Complaint), Insight received the television broadcasts of the Boston television stations through antennas, which are specially tuned to the particular television station frequencies to allow for receipt of the particular television signal radio waves with the least amount of interference. In receiving the signals, the antennas convert the radio waves to an analog electrical signal, which is carried on a wire to a receiver. Each television signal runs through a receiver, which converts the analog electrical signal into standard input for video display or input to video compression equipment. The Signals are then relayed by wires to the video compression equipment supplied by Bell Canada, which is physically located on racks at the Videocom facility in Dedham, Massachusetts. This entire process takes place within a physical area of under 100 feet (i.e. the distance between the antennas and the video compression equipment).

8. The receipt and relay of the Signals ultimately to the video compression equipment is simultaneous with their initial broadcast.

9. Insight does not control or alter the content of the Signals provided to the video compression equipment.

10. Other than delivering the Signals to the designated video compression equipment, Insight does not control the recipients, if any, of the Signals it receives.

11. During the relevant period referred to in the complaint and amended complaint, Insight, consistent with the steps referred to in Paragraphs 5 through 10 above, received the television signals of six Boston television stations and relayed those signals to video compression equipment provided by Bell Canada. ExpressVu, in turn, allegedly transmitted to locations in Canada the programming of the Boston television stations affiliated with the CBS, Fox, and ABC networks -respectively, WBZ, WFXT, and WCVB (the "Boston affiliates").

These stations showed NFL game telecasts on Sunday afternoons throughout the NFL season (the regular season begins in September and ends with the Super Bowl in January). On September 26, 1999, WBZ televised the game between the Denver Broncos and the Tampa Bay Buccaneers and WFXT televised the game between the Minnesota Vikings and the Green Bay Packers. On September 27, 1999, WCVB televised the game between the San Francisco 49ers and the Arizona Cardinals. On October 3, 1999, WBZ televised the games between the New England Patriots and the Cleveland Browns and the New York Jets and the Denver Broncos and WFXT televised the game between the Carolina Panthers and the Washington Redskins. On October 4, 1999, WCVB televised the game between the Buffalo Bills and the Miami Dolphins.

### III. *Contention of the Parties*

Insight contends that it is exempt from plaintiff's copyright claims because of the fact that it is a "passive carrier" within the meaning of 17 U.S.C. § 111(a)(3). Plaintiff in turn, contends that the defendant is not a passive carrier under that statute because Insight is neither a "carrier" nor a "passive" carrier. And plaintiff again suggests that summary judgment is inappropriate absent further discovery.

### IV. *The Summary Judgment Standard*

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1).

To survive a motion for summary judgment, the opposing party must demonstrate that there is a genuine issue of material fact requiring a trial. Fed.R.Civ. P., 56(e); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). As the Supreme Court recently has made clear, the standard for granting summary judgment "mirrors" the standard for a directed verdict under Fed.R.Civ.P. 50(a). *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). That is, the inquiry focuses on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citing *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

A plaintiff may not obtain a trial merely on the allegations in its complaint, *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289–290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), or by showing that there is "some metaphysical doubt as to the material facts," *Matsushita, supra,* 475 U.S. at 586, 106 S.Ct. 1348 (citations omitted). Where the non-moving party will bear the burden of proof at trial, Rule 56(c) mandates the entry of summary judgment against that party where it "fails to make a showing sufficient to establish the existence of an element essential to that party's case...." *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548. That is to say, to avoid summary judgment, the opposing party "...must produce at least some evidence *reasonably* affording an inference supporting the existence of a triable issue of fact [with respect to the

element which the opposing party must establish at trial]." *Santiago, et al. v. Group Brasil, Inc.*, 830 F.2d 413, 416 (1st Cir.1987).

Additionally, as it is applicable here, Rule 56 favors *brevis* disposition in appropriate cases, so that the moving party is not required to incur the costs attendant to discovery. In that connection, this court, as has other courts, prescribed rules concerning procedures attendant to motions for summary judgment. Our Local Rule 56.1[7] makes clear, among other things, that a party opposing a motion for summary judgment must ·include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried. And the United States Court of Appeals for this Circuit has previously ruled that a local rule with this requirement is clearly appropriate and consistent with Rule 56, F.R. Civ. P., and should be enforced. *Betances v. Sea–Land Service, Inc.*, 248 F.3d 40, 2001 WL 454524, No. 00–2153 (1st Cir. 2001). *See also Ruiz Rivera v. Riley*, 209 F.3d 24, 28 (1st Cir.2000); accord *Morales v. A.C. Orssleff's EFTF*, 246 F.3d 32, 34 (1st Cir.2001).

## V. *Discussion*

1. *Whether Insight is a "Carrier" within the Meaning of 17 U.S.C. § 111(a)(3)*

▮ Plaintiff does not gainsay that, if the conduct of Insight in the circumstances of this case fall within the ambit of 17 U.S.C. § 111(a)(3), it cannot succeed in its copyright claims against Insight.

Plaintiff first contends that Insight, in the circumstances of this case, is not a "carrier" within the meaning of 17 U.S.C. § 111(a)(3).[8]

In this court's view, however, plaintiff's general argument misses the mark, and its reliance on *Infinity Broadcasting Corp. v. Kirkwood*, 63 F.Supp.2d 420 (S.D.N.Y. 1999), falls short on the facts.

In contending that Insight is not a "carrier" within the meaning of 17 U.S.C. § 111(a)(3), plaintiff relies exclusively on the fact, not disputed, that insight did not own the "wires"—the hardware, if one will—over which the signals were transmitted. Nothing in the authorities or legislative history, however, suggest that Congress intended that section be read in such a crabbed fashion.

Congress, in enacting Section 111(a)(3), did not define the term "carrier" in that section. But the current version is now (and was at all relevant times referred to in the complaint and amended complaint) in its third iteration. As one court has observed (*Hubbard Broadcasting, Inc. v. Southern Satellite Systems, Inc.*, 593 F.Supp. 808, 817 (D.Minn.1984), *aff'd* 777 F.2d 393 (8th Cir.1985))—

---

7. See note 6, 15 above.

8. That statute provides in pertinent part:

> (a) Certain Secondary Transmissions Exempted.—The secondary transmission of a performance or display of a work embodied in a primary transmission is not an infringement of copyright if—
>
>    \*    \*    \*    \*    \*    \*
>
> (3) the secondary transmission is made by *any carrier* who has no direct or indirect control over the content or selection of the primary transmission or over the particular recipients of the secondary transmission, and whose activities with respect to the secondary transmission consist solely of providing wires, cables, or other communications channels for the use of others: Provided, That the provisions of this clause extend only to the activities of said carrier with respect to secondary transmissions and do not exempt from liability the activities of others with respect to their own primary or secondary transmissions...(Emphasis added).

132

Furthermore, Congress in the 1976 Act intended to *expand* the coverage of the exemption beyond the traditional common carrier concept, rather than limit it as plaintiff suggests. While the exemption was originally for "common carriers," it was later expanded to cover new types of carriers such as "a common, contract or special carrier" and finally broadened in the 1976 Act to "*any carrier*," evidencing Congress' intent not to limit the class to a particular type of carrier. (Emphasis added).

Consistent with this expansive language used by Congress, The Federal Communications Commission has opined, *inter alia* (60 F.C.C.2d 261, at ¶ 101):

> Inasmuch as we have decided that resellers will be engaged in interstate communication by wire and radio, we now shall determine whether they are common carriers within the meaning of the Act.
>
> \*     \*     \*     \*     \*     \*
>
> ...we perceive no difference between resale and traditional communications common carriage. The fact that an offeror of an interstate wire and/or radio communication service leases some or all

of its facilities—rather than owning them—ought not have any regulatory significance.

That, in turn, is consistent with the statutory definition of a "telecommunications carrier" as set forth in Title 47, United States Code, Section 153(44).[9] And it is consistent with those cases indicating that a reseller of the services similar to that provided by the defendant in this case is a carrier, not withstanding the fact that the reseller did not own all of the facilities used for the retransmission, *e.g.*, *American Telephone and Telegraph Co. v. Federal Communications Comm's*, 572 F.2d 17, 20 and n. 4 (2d Cir.), *cert. denied*, 439 U.S. 875, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978). And it is fully consistent with practical business practices. Just as the Copyright Act should be construed with an understanding of changing technologies, *Hubbard Broadcasting, Inc. v. Southern Satellite Systems, Inc.*, 777 F.2d 393, 400 (8th Cir.1985), *cert. denied*, 479 U.S. 1005, 107 S.Ct. 643, 93 L.Ed.2d 699 (1986),[10] so should it be construed consistently with the real business world—a world where "outsourcing" is an accepted method of doing business.[11]

9. That section provides in pertinent part:
   (44) Telecommunications carrier
   The term "telecommunications carrier" means *any provider of telecommunications services*, except that such term does not include aggregators of telecommunications services (as defined in section 226 of this title). (Emphasis added).

10. There that court observed:
    Hubbard contends that the WTBS microwave signal (retransmitted by Southern and the cable systems) is not protected by the compulsory licensing provisions of section 111 since in its view these provisions are applicable only in situations in which the secondarily transmitted television signal is initially broadcast over the air. In advancing this argument, Hubbard forgets that "[i]nterpretation of the [Copyright] Act

must occur in the *real world of telecommunications*, not in a vacuum." *Eastern Microwave, Inc.*, 691 F.2d at 132. *Hubbard's view, if accepted, would largely freeze for section 111 purposes both technological development and implementation. And, by consequence, it would force both primary and secondary transmitters alike to forego available, economically feasible technology. We reject this stand still status quo oriented view of the compulsory licensing provisions.* (Emphasis added).

11. And, of course, that is, from a practical business perspective, precisely the relationship between defendant Insight and Videocom. Insight was the management component of the relationship, involved in the promotional, marketing, and contracting matters. Videocom and its personnel, on

Against all of this, plaintiff relies almost exclusively on one district court case in support of its position that Insight is not a carrier within the meaning of Section 111(a)(3)—to wit: *Infinity Broadcasting Corp. v. Kirkwood*, 63 F.Supp.2d 420 (S.D.N.Y.1999). But that case is clearly of a different sort. In that case, the defendant, Kirkland was not, as is the case with Insight, in the business of providing transmissions of signals. Although not apparent from the cite provided by the plaintiff, the prior history of that case, to wit: *Infinity Broadcasting Corp. v. Kirkwood*, 965 F.Supp. 553 (S.D.N.Y.1997),[12] shows that the defendant's primary business in that case was not the retransmission of signals, but rather in providing a dial-up service for a fee. As the district judge observed, *inter alia*, in that earlier opinion (965 F.Supp. at 554) -

> Defendant Wayne Kirkwood d/b/a Media Dial–Up operates "listen lines" through which *subscribers* can listen to radio broadcasts, including Infinity broadcasts, over the telephone. The service is marketed to radio stations, radio consultants, advertisers, performance rights organizations and others in the advertising and entertainment industries.
>
> \*   \*   \*   \*   \*   .\*
>
> Kirkwood is a citizen of Texas. He does *business for profit* under the name Dial–Up Media.

## Kirkwood's Service

Kirkwood has placed radio receivers in America's ten largest radio markets.

Each receiver is plugged into an electrical outlet and connected to telephone lines. *Dial–Up subscribers pay Kirkwood a fee in exchange for a list of confidential telephone numbers that enables them to access the equipment.* The equipment allows the subscriber to select from among all of the signals pulled in by a given receiver the particular signal or signals to which the subscriber wishes to listen by giving commands through a telephone keypad, The *subscriber* thus is able to dial the "listen line" for a given city and hear real-time retransmissions of radio broadcasts from that city. The retransmissions are unaltered except for audio quality degradation.

Subscribers use the Kirkwood service for such purposes as auditioning on-air talent, verifying the broadcast of commercials, and listening to a station's programming format and feel. (Emphasis added)

On those facts, the district judge, not surprisingly, concluded that the defendant was not a carrier within the meaning of Section 111(a)(3). And that is clearly not inconsistent with a finding in this case that the defendant is a carrier, since the defendant in *Kirkland* was merely an entrepreneur in a subscriber business who just happened to transmit signals ancillary to his primary business.

Accordingly, based on settled principles of statutory construction and the prece-

___

the other hand, were the "techies", so to speak, with the technological "know how" and facilities to cause the transmission. This is not an unusual relationship. Would it be any different, one might reasonably ask the plaintiff, if, instead of the subcontracting relationship, the management team of defendant Insight was but another office component of Videocom?

**12.** On the first go round, the district judge had ruled in favor of the defendant on the basis of "fair use", not reaching the Section 111(a)(3) aspect of the case. That ruling was reversed on appeal. *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir.1998). Plaintiff cites from the decision on remand which did not recount all of the facts as set forth in the earlier opinion, 965 F.Supp. 553.

dent set forth above, this court finds and concludes that, on the undisputed material facts set forth in the record before this court, Insight has shown that it is a carrier within the meaning of Section 111(a)(3).

2. *Whether Insight is a "Passive" Carrier within the Meaning of 17 U.S.C. § 111(a)(3)*

■ Plaintiff further contends that even if Insight is a carrier within the meaning of Section 111(a)(3), it was not a "passive" carrier as that term is defined. In support that position, plaintiff seemingly contends that it was not "passive" in the circumstances of this case because: (a) "...Insight serves as Bell Canada's representative in the United States for the purpose of obtaining Boston Signals[,]" and because (b) Insight "...identified and recommended facility used by Bell Canada, and negotiated and implemented service agreements (such as the agreement with Videocom), and coordinated and verified the installation of transmission equipment at the local relay site."

As to the first point, this court has reviewed the cited references,[13] otherwise not properly before this court,[14] and cannot fairly conclude that those references or any reasonable inferences to be drawn therefrom point to a finding that "...Insight serves as Bell Canada's representative in the United States for the purpose of obtaining Boston Signals." To the contrary, that record to which plaintiff refers suggests that Bell Canada arranged to provide the video compression equipment in the Videocom facility to which the signals were relayed, and it was Bell Canada which negotiated for any further retransmissions of the Boston signals.

As to plaintiff's second point—*i.e.,* that Insight "...identified and recommended facility used by Bell Canada, and negotiated and implemented service agreements (such as the agreement with Videocom), and coordinated and verified the installation of transmission equipment at the local relay site." that record evidence only shows that that activity occurred as a startup activity, before the transmissions in issue, and plaintiff has failed to show that any of that activity were in "respect to the secondary transmission[s]" within the meaning of Section 111(a)(3).

This court accordingly concludes that the undisputed material facts show that Insight was a "passive" carrier within the meaning of Section 111(a)(3).

3. *The Need for Further Discovery*

■ Finally, in an almost recurring theme, plaintiff says that summary judgment is inappropriate absent further discovery. We have pointed out the procedural history relating to this matter above, pp. 2—6. Plaintiff surely must have known as early as November 9, 1999, when Insight filed its opposition to plaintiff's motion for a preliminary injunction, that Insight contended that it was a passive carrier entitled to exemption under Section 111(a)(3). On May 3, 2000, after the initial scheduling conference, plaintiff was free to conduct such discovery necessary to meet the defense asserted by Insight. Insofar as this court can determine, plaintiff did little in that regard, knowing full well that the defendant intended to file a motion for summary judgment based on Section 111(a)(3). On one, if not two, occasions, this court made it clear that plaintiff could obtain additional discovery to meet the

---

13. In its Opposition (# 66), plaintiff, for that proposition, refers, in a footnote (p. 13, n. 13), to certain depositions and/or declarations.

14. For the reason that plaintiff did not file a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, see the discussion at p. 11, and notes 4 and 13, *supra.*

motion for summary judgment simply by complying with Rule 56(f), F.R. Civ. P.[15] Plaintiff, however, spurned the invitation and simply ignored the Federal Rules of Civil Procedure and the Local Rules of this Court in this regard.[16] Plaintiff further ignored the Local Rules of this Court in not filing a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, as required by Local Rule 56.1. And beyond all of that, its claim that this court erred in not deferring decision on defendant's motion for summary judgment must be considered waived for failure to file an objection to the various orders of this court denying plaintiff discovery. See Rule 72(a), F.R. Civ. P.[17] Plaintiff's claim that it is entitled to further discovery comes far too late and in a manner which simply ignores the applicable rules of procedure.

## V. *Conclusion*

For the reasons set forth above, this court recommends that the district judge to whom this case is assigned allow defendant Insight's Motion for Summary Judgment on Sixth Affirmative Defense (# 50).

---

15. Rule 56(f) provides:
(f) When Affidavits are Unavailable. Should it appear from the *affidavits* of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just. (Emphasis added).

16. Of course, Rule 56(f), F.R. Civ. P., note 6, 15, *supra*, does not contemplate unbridled discovery. That is the reason that that rule requires a moving party to file an appropriate affidavit in support of the motion. In the circumstances, this court can only fairly conclude that plaintiff was not in a position to aver by affidavit that the discovery sought— whatever it might be—was relevant or material to defendant's motion for summary judgment.

17. That rule provides:
(a) Nondispositive Matters. A magistrate judge to whom a pretrial matter not dispositive of a claim or defense of a party is referred to hear and determine shall promptly conduct such proceedings as are required and when appropriate enter into the record a written order setting forth the disposition of the matter. Within 10 days after being served with a copy of the magistrate judge's order, a party may serve and file objections to the order, *a party may not thereafter assign as error a defect in the magistrate judge's order to which objection was not timely made.* The district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law. (Emphasis added).